UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SCOTT DENNING,<br><br>    Plaintiff,<br><br>      v.<br><br>LINCOLN COUNTY SHERIFF'S OFFICE, a public entity; and LINCOLN COUNTY, a public corporation,<br><br>    Defendants. | Case No. 1:18-cv-00473-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court are two motions: Plaintiff's Motion to File a Second Amended Complaint and Defendants' Motion for Summary Judgment. *See* Dkts. 26, 30. For the reasons explained below, the Court will allow plaintiff to assert new state-law claims for defamation and invasion of privacy but will deny his request to add a new due process claim. As for the summary-judgment motion, plaintiff's whistleblower, defamation, and due process claims survive; the remaining claims do not.

**FACTS**

**1.  The Strunk Arrest**

On October 31, 2017, Lincoln County Sheriff Rene Rodriguez went to a Halloween party at a private residence. He was off duty at the time, but when he heard the squealing tires of a vehicle driving by, he concluded the driver must be driving recklessly, so he left the party to investigate. He initially stopped the wrong vehicle but eventually identified Gene Strunk as the driver of the vehicle he had heard.

Sheriff Rodriguez went to Strunk's house and knocked on the door. Strunk's father answered. After asking if Gene Strunk was there, Sheriff Rodriguez walked inside without any verbal invitation to do so, spotted Gene, and began talking to him. Rodriguez says he wanted to take the conversation outside so he reached out to "to tap him, you know to guide him towards the door," *Rodriguez Dep.* at 77:17-18, but then he believed Gene appeared ready to strike him so he pushed him toward the door and then outside using "open-palm heel strikes." *Id.* at 79:6-12. Outside, the two "scuffled," and Rodriguez shoved Strunk off the front porch. *See id.*; *see also Denning Dep.* at 125:21 to 126:5. Rodriguez did not have handcuffs with him, so he otherwise restrained Strunk until backup officers arrived. Rodriguez instructed backup officers to arrest Strunk for two felony offenses – resisting and obstructing a police officer.

Denning says he arrived on the scene after the backup officers were there and thus did not witness the altercation between Strunk and Sheriff Rodriguez. He did, however, understand that Sheriff Rodriguez had instructed the officers to take Strunk to the county jail and book him for obstructing. He also had a conversation with Rodriguez at the scene, and Rodriguez reportedly told Denning "how he threw Strunk off his front porch and forcefully wrestled Strunk on the ground." *Denning Aff.*, Dkt. 33-3, ¶ 19. Denning says Sheriff Rodriguez was "very agitated and excited," and that he asked Rodriguez multiple times if he really wanted to arrest Strunk. Denning was concerned that Rodriguez was violating Strunk's constitutional rights and that Lincoln County would get sued. *Id.* ¶¶ 22-23; *see also Denning Dep.* at 127:16-23.

A day or two after the arrest, Denning spoke to Chief Deputy Stephen Phillips. Denning told Phillips that he "felt we possibly had a bad arrest that occurred." *Denning Dep.* at 123:9-12. Denning reports he was concerned about multiple violations of the law, including a violation of Strunk's constitutional rights; he specifically told Phillips he was concerned about a § 1983 action. Denning said neighbors who were on the scene during the arrest told him they wanted to file a complaint against Sheriff Rodriguez for excessive force. *Denning Aff.* ¶ 23. Ultimately, the prosecutor assigned to the case did not prosecute Strunk, based on his belief that "Rodriguez violated the 4th Amendment at a

minimum . . . ." *Id.* ¶ 25; Ex. 1 thereto.

## 2.      The Evidence Seminar

Roughly two weeks after the Strunk arrest – and unrelated to that arrest –
Lincoln County Sergeant TK Smith attended an evidence-handling seminar. *See*
*Kingsland Report,* Dkt. 35-4, at 6. At the class, Smith met Rick Bernsen, an
evidence technician for Jerome County. Bernsen happened to mention that he had
dropped off some evidence at Lincoln County. Smith became concerned when he
heard that because he was the evidence custodian but didn't know anything about
it. Bernsen said he had dropped off the evidence with Pam Piper, a civil deputy for
Lincoln County Sheriff's Office. *Id.* at 3. The parties do not dispute that Piper left
the evidence unattended in the mail room. *See Pl. Stmt. of Facts,* Dkt. 33-1, ¶ 18.

On a break, Smith called the office to ask about the evidence. He spoke to
Denning. Denning says that some time in November 2017, he found some
evidence "stuffed behind the mail boxes . . . ." *Denning Aff.,* Dkt. 33-3, ¶ 52.
Denning says the evidence was already "in poor condition, the bags
shredded, . . . ." *Id.* He immediately told Deputy Phillips about it and told Phillips
he would put the bags in his (Denning's) office.  Phillips did not object to that
plan. *Id.*

## 3.      The Internal Affairs Investigation

After the evidence seminar, Sheriff Rodriguez initiated an internal affairs

investigation of Denning and Piper. Sheriff Rodriguez explains that the purpose of the investigation was "to look into evidence handling issues that had come to my attention within the office." *Rodriguez Dec.*, Dkt. 26-6, ¶ 2. Denning says this is untrue; he says Sheriff Rodriguez initiated the investigation to retaliate against him for having raised concerns about the Strunk arrest. Denning says his interpretation is supported not only by the timing of the internal affairs investigation but also by the fact that the investigation was not aimed solely at evidence-handling. Rather, for Denning alone, the Sheriff tacked on another issue – Denning's earlier decision to take a firearm into the Jerome County jail. Denning says it was illogical to include that incident in the internal affairs investigation because he had already admitted he took a gun into the jail and had already been reprimanded by his supervisor. According to Denning, the incident was over and there was nothing left to investigate. *Denning Aff.*, Dkt. 33-3, ¶ 58.

Denning was suspended on December 4, 2017, and Jerome County Sergeant Chad Kingsland was assigned as the internal affairs investigator. Shortly before, on November 27, 2017, Kingsland met with Rodriguez and Phillips at the Lincoln County Sheriff's office. *See Def. Stmt. of Facts,* Dkt. 26-2, ¶ 13. During the meeting, Kingsland and Phillips went into Denning's office and inspected a locked cabinet. Inside the cabinet, they found evidence that should have been stored in the evidence locker. They also report having found confidential files in the locked

cabinet, including what defendants describe as Denning's "Brady file." *See Id.*

¶¶ 13-14; *Rodriguez Dec.*, Dkt. 26-6, ¶ 5. This file is one that the Lincoln County

prosecutor maintained on Denning. *See Pl. Stmt. of Facts,* Dkt. 33-1, ¶ 4.

Rodriguez says he had received this file from the prosecutor a few weeks earlier.

*Rodriguez Dec.,* Dkt. 26-6, ¶ 8.

When Phillips and Kingsland told Rodriguez about the files they found in

the cabinet, Rodriguez said he then discovered that files were missing from his

desk drawer. He concluded that Denning must have stolen the file from his office.

Kingsland interviewed Denning on or about December 18, 2017. *See Pl.*

*Stmt. of Facts*, Dkt. 33-1, ¶ 22.[1] Kingsland reported that when he asked Denning

about the allegedly stolen files, Denning said he didn't know how those files got

there, but assumed that they may have been in the cabinet when he inherited it

from a former Lincoln County employee.

Denning denies taking anything from Rodriguez's office, and he also points

out that the record on this issue is muddled. During his interview with Kingsland,

Denning was never shown actual documents or files but was instead shown only

---

[1] For purposes of deciding this motion, the Court will assume the interview occurred on
December 18, 2017, as plaintiff says this is when it occurs. Note, however, that Kingsland's
report indicates that he conducted the interview on December 10, 2017, and defendants say the
interview occurred on December 8, 2017. *Compare Kingsland Report,* Dkt. 35-4, at 10, *with Def.
Statement of Facts,* Dkt. 26-2, ¶ 15. The difference in dates is immaterial, however.

photos of some portions of files. Denning says when he answered Kingsland's questions, he simply assumed that the files were left over from when McClure used the cabinet. He also points out that there is not a thorough record and that the investigation was incomplete regarding where the files were, when they were there, etc. Denning theorizes that Rodriguez may have been trying to frame him.

## 4.      Denning's Termination

Kingsland issued his report on December 26, 2017, and Sheriff Rodriguez fired Denning three days later. *See Report*, Dkt. 35-4, at 15; *Denning Aff.* Dkt. 33-3, ¶ 35. Rodriguez says after he read Kingsland's report, he became convinced that Denning had not only stolen a file from Rodriguez's office but that Denning had also lied to the investigator about having done so. He says Denning's explanation – that maybe the file was in the cabinet when he inherited it from another deputy – was implausible because Rodriguez had received the file in "early November 2017," but the previous deputy had been gone for more than a year.

Denning's termination letter, which Rodriguez signed, doesn't say anything about Denning stealing files and lying to internal-affairs investigators. Rather, the letter indicates only that Denning's services were no longer required. *See Dec. 29, 2017 Letter,* Dkt. 34-4. Rodriguez has confirmed, however, that he fired Denning because he believed Denning had stolen files from his desk and then lied about having done so.

**5.      The POST Decertification Investigation**

Shortly after firing Denning, Sheriff Rodriguez reported to the Idaho State Peace Officer Standards Council (POST)[2] that Denning had violated POST's ethical standards. In a follow-up phone call with the POST investigator, Sheriff Rodriguez reiterated that Denning had taken files from Rodriguez's desk and then lied about it. *See Smith Dep.* at 60:18-23 & 69:1 to 70:4.

A POST decertification investigation is currently pending. POST's policy is to stay its investigation in the event of a lawsuit. Denning filed this lawsuit in March 2018 and the POST investigation had not concluded at that time. Accordingly, the decertification investigation will not move forward until this lawsuit has been resolved. *See Smith Aff*, Dkt. 26-3, ¶ 6.

**6.      Denning's Application to be Lincoln County Sheriff**

After he was fired and while the POST investigation remained open, Denning looked for other jobs. Roughly 16 months after he was terminated, Denning applied for the Lincoln County Sheriff position – Sheriff Rodriguez had resigned – and the Lincoln County Republican Central Committee selected Denning as one of three finalists for the position.

---

[2] POST – an acronym for the Idaho *P*eace *O*fficer *S*tandards and *T*raining Council – is a council established by the Idaho legislature. *See* Idaho Code § 19-5102.

On April 24, 2019, Commissioner Rebecca Wood attended a public meeting. Denning alleges that during the meeting, Commissioner Wood publicly stated that "one of the applicants had 500 plus pages of disciplinary issues from POST, numerous use of force lawsuits, a very large lawsuit against the county and had a pending decertification." She also stated that, "This is a horrible situation for Lincoln County, possibly life-threatening." She allegedly reiterated these comments to the press.

Denning filed and served a Notice of Tort Claim on Lincoln County on May 13, 2019. On August 14, 2019, Denning filed a motion to amend his complaint to include new claims based on Commissioner Woods' statements. Meanwhile, defendants had filed their motion for summary judgment.

## DISCUSSION

The Court will first resolve plaintiff's motion to amend and then turn to defendants' motion to summary judgment.

**1.      The Motion to Amend**

The deadline to file motions to amend expired on March 22, 2019. *See Case Management Order,* Dkt. 10. Plaintiff filed his motion to amend over four months after that deadline.

### A. The Governing Legal Standard

Motions to amend a pleading filed after the scheduling order deadline has

expired are governed not by the liberal provisions of Rule 15(a) of the Federal Rules of Civil Procedure but by the more restrictive provisions of Rule 16(b) requiring a showing of "good cause." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604 (9th Cir. 1992). The focus of Rule 16(b)'s good cause standard is the diligence of the moving party. *Id.* at 608. A court should find good cause only if the moving party shows it "could not reasonably meet the established timeline in a scheduling order despite [its] diligence." *DIRECTV, Inc. v. Busdon*, No. CV-04-265-S-LMB, 2005 WL 1364571, *1 (D. Idaho June 8, 2005).

When determining whether to grant a motion to amend outside the deadline imposed in the scheduling order, a court may also consider "the existence or degree of prejudice to the party opposing the modification" *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d at 609. But while a court is allowed to consider any prejudice that may occur, it should focus its inquiry "upon the moving party's reasons for seeking modification." *Id*. If the party moving to amend "was not diligent, the inquiry should end." *Id.*

## B. Diligence

Plaintiff was diligent in filing this motion to amend. The conduct forming the basis of the amendments occurred in April 2019 – just over a month after the March 22, 2019 deadline for moving to amend. Upon learning of this conduct, plaintiff promptly filed a Notice of Tort Claim, which prevented him from bringing

his state claims for 90 days. *See* Idaho Code § 6-909. Then, just 93 days after filing

that notice, plaintiff filed his motion to amend.[3]

The Court has allowed amendments under somewhat similar circumstances.

For example, in *Gambrel v. Twin Falls Cnty.*, No. 1:12-cv-369-WBS, 2014 WL

1612677, at *1 (D. Idaho Apr. 22, 2014), the Court granted leave to amend under

Rule 16(b) when "amendments could not have been filed earlier because they

reflect information that plaintiff obtained from depositions that it conducted 'up

until the discovery cutoff date.'" Similarly, the Court found good cause when

defendants did not produce evidence in their initial disclosures, which served as the

basis for amendments. *Hollist v. Madison Cty.*, No. 4:13-CV-00139-BLW, 2013

WL 5935209, at *1 (D. Idaho Nov. 1, 2013).

Defendants argue that plaintiff didn't need to wait out the statutory 90-day

period before filing new federal claims. *See Response Br.*, Dkt. 32, at 4. In other

words, defendants suggest that plaintiff should have filed his motion to amend

piecemeal – first he could have filed a motion to add a new § 1983 claim, and then

90 days later, he could have filed a motion to amend to add new state-court claims.

The Court does not agree that this would be have been the best practice. Serial

_____

[3] Plaintiff filed a notice of tort claim on May 13, 2019 and his motion to amend on
August 14, 2019.

motion practice such as this would have been burdensome and inefficient. More to the point, though, the Court cannot find that Denning demonstrated a lack of diligence by waiting for the statutory 90-day period to expire.

## C. Prejudice

Defendants' argument regarding prejudice is more compelling. Here, defendants first point out that plaintiff's newly proposed claims arise out of a distinct set of facts that occurred sixteen months after the key fact in this case – Denning's termination. The operative complaint alleges five claims based on Denning's December 2017 termination: (1) wrongful termination under Idaho's whistleblower statute; (2) interference with prospective economic advantage; (3) defamation; and (4) violation of due process; and (5) negligent infliction of emotional distress (NIED). *See* Dkt. 1-51.

Plaintiff's proposed new claims arise out of conduct that occurred in April 2019. Specifically, Denning proposes to add the following:

First, he seeks to add a new claim for invasion of privacy, based on Commissioner Wood's April 2019 statements.

Second, although he does not seek to allege a new, separate defamation claim, his existing defamation claim is now based on two temporally distinct set of facts. First, Denning alleges that Lincoln County and Lincoln County Sheriff's Office defamed him in December 2017, when Sheriff Rodriguez told POST that

Denning had stolen files and then lied about having done so. Second, Denning alleges that defendants defamed him again in April 2019, when Commissioner Wood made her statements.

Third, Denning seeks to amend his § 1983 claim. He continues to claim that he was wrongly denied a name-clearing hearing in connection with his December 2017 termination. *See Proposed Am. Compl.* ¶ 86. But he now proposes to add a new allegation – that in April 2019, Lincoln County "*again* infringed upon Denning's liberty interests" via Commissioner Wood's comments. *See Proposed Am. Compl.*, Dkt. 30-3, ¶¶ 82-83 (emphasis added).

Defendants argue that these amendments do not have any common legal questions with those presented by Denning's termination. Defendants also say they will be prejudiced if they are forced to begin anew and develop defenses to Denning's new claims. *See Response,* Dkt. 32. They also say the Court would need to vacate the existing scheduling deadlines. *Id.*, at 9. Plaintiff says amending his complaint would not require any new discovery.

On the one hand, the Court is loath to slow the progress of this case and if plaintiff is permitted to add new claims, the Court would be inclined to allow defendants an opportunity to conduct discovery on the new claims. On the other hand, it seems far more efficient for plaintiff to pursue his proposed new claims in the context of this lawsuit. If Denning were to pursue two separate actions against

Lincoln County – one based on his December 2017 termination, and the other based on his April 2019 efforts to be rehired and Commissioner Wood's comments – it seems relatively likely that there would be some overlap. According to plaintiff's theory, Commissioner Wood's comments demonstrate, in part, the harm Denning suffered when Sheriff Rodriguez fired him for alleged dishonesty and then made the comments that ultimately triggered the POST decertification investigation.

Under these circumstances, the Court will grant Denning's motion to amend his complaint to state invasion-of-privacy and defamation claims based on Wood's comments. The Court will not, however, allow Denning to add to his existing § 1983 claim. As explained below, Wood's comments were not made in the course of Denning's termination and therefore do not support Denning's existing Fourteenth Amendment claim, nor do they independently support a new due process claim. *See discussion infra ¶* 2.F.(1); *Campanelli v. Bockrath*, 100 F.3d 1476 (9th Cir. 1996).

## 2. Defendants' Motion for Summary Judgment

As noted above, three of plaintiff's five claims will survive summary judgment: his state whistleblower claim; his defamation claim; and his due process claim. The Court will grant summary judgment in defendants' favor on the remaining claims.

## A. The Governing Legal Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

## B. The Whistleblower Claim

Denning's first claim for relief is brought under Idaho's Whistleblower Act, which bars an employer from taking adverse action against an employee who "communicates in good faith . . . a violation or suspected violation of a law, rule or regulation . . . ." Idaho Code § 6-2104(1)(a). To establish a prima facie retaliation claim, Denning must show: (1) he was an employee who engaged or intended to engage in protected activities; (2) his employer took adverse action against him; and (3) a causal connection between the protected activity and the adverse action. *See Van v. Portneuf Med. Center*, 212 P.3d 982, 988 (Idaho 2009).

### 1) **Protected Activity**

Defendants argue that Denning did not engage in "protected activity."

Denning voiced concerns about Sheriff Rodriguez's use of force against Strunk; he

said he was concerned about excessive force and a potential § 1983 action. And

given the facts described above, Denning's concern was objectively reasonable.

Reporting such a violation – or even a "suspected violation" – is protected activity.

*See, e.g., Black v. Idaho State Patrol*, 314 P.3d 625 (Idaho 2013).

Defendants argue that two cases – *Black v. Idaho State Patrol*, 314 P.3d 625

(Idaho 2013) and *Mallonee v. State*, 84 P.3d 551 (Idaho 2004) – support their

argument. Both cases are distinguishable.

In *Black*, the plaintiff presented "absolutely no evidence" to support a claim

that his employer had violated the law. *See* 314 P.2d at 629. That is not the case

here; viewing the record evidence in Denning's favor, Denning had a reasonable,

objective basis for suspecting Sheriff Rodriguez violated Strunk's constitutional

rights during the October 31, 2017 arrest.

In *Mallonee*, the plaintiff argued that the Whistleblower Act's reference to

reporting violations or suspected violations of a "law, rule, or regulation" *see* Idaho

Code § 6-2104, should be broadly interpreted to include *policies* of the state's

correctional department. The Idaho Supreme Court disagreed. *Mallonee*, 314 P.2d

at 620-21. Denning, however, did not report that Rodriguez violated a state policy;

he reported that Rodriguez may have violated Strunk's constitutional rights. Thus, notwithstanding *Black* and *Mallonee*, the Court easily concludes that Denning engaged in protected activity.

### 2) Causation

The next issue is whether Denning has established causation. Causation is an issue of fact for the jury and can only rarely can be determined on a motion for summary judgment. *See Van*, 212 P.3d at 980-90 (*citing Curlee* 224 P.3d at 396). Here, the short amount of time between the protected activity and Denning's termination supports a reasonable inference that Lincoln County fired Denning because he voiced concerns about the Strunk arrest.

Under the *McDonnell Douglas* analytical framework, the Court next considers Lincoln County's proffered, non-retaliatory reasons for firing Denning. *See generally McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Denning, however, argues that under *Curlee v. Kootenai County Fire & Rescue*, 224 P.3d 458 (Idaho 2008), the Court cannot properly apply the *McDonnell Douglas* framework at the summary-judgment stage. *See id.* at 463. *Curlee* held that *McDonnell Douglas* does not apply at summary judgment. This Court, however, has already concluded that Idaho federal district courts must follow *McDonnell Douglas* notwithstanding *Curlee* because the *McDonnell Douglas* burden-shifting rule is a federal procedural rule. *See Brown v. City of Caldwell*, No. 1:10-cv-536-

BLW, 2012 WL 892232 (D. Idaho Mar. 14, 2012) (*citing Dawson v. Entek Int'l*, 630 F.3d 928, 935 (9th Cir. 2011)). The Court will therefore consider Defendants' evidence that Denning was fired because Rodriguez believed Denning took files from his office and then lied to the internal affairs investigator about having taken them. Given this evidence, the burden shifts back to Denning to show that the proffered reason is pretextual.

To show pretext, a plaintiff does not necessarily need to provide direct evidence of retaliation; rather, the plaintiff may provide enough circumstantial evidence to create a material question of fact on pretext. Among other things, a plaintiff may indirectly show that defendants' explanation is "unworthy of credence." *Dawson*, 630 F.3d at 936.

Denning has satisfied this burden. The timing of his termination alone could lead to a reasonable inference that there was a connection between his report about the Strunk arrest and his firing and that the proffered reasons for his termination are pretextual. Further, he has pointed out at least one irregularity with his termination: he was not given any warnings before he was terminated whereas the other individual who was investigated was. He also points out that the internal affairs investigation included an issue (the gun incident) that logically would not have been included. Also, evidence relating to the proffered non-retaliatory reason for his termination is a credibility issue in any event: Denning says he didn't take

any files out of Rodriguez's desk and that Rodriguez fired him as a retaliatory measure; Rodriguez says Denning must have taken the files and then lied about it and, based on that belief, he fired Denning. A jury will have to decide who's telling the truth.

In sum, when the evidence is viewed in the light most favorable to Denning, there is a material question of fact regarding whether the legitimate reason given by the County was merely a pretext. The Court will therefore deny defendants' motion for summary judgment on the whistleblower claim.

## C. Defamation

Defendants argue that Denning's defamation claim fails as a matter of law for two reasons. First, they argue that Rodriguez expressed only an opinion regarding Denning – not any facts. Second, they argue that they are immune from suit under Idaho Code § 6-904(3). The Court is not persuaded by either argument.

### 1) Opinions versus Facts

Opinions are protected speech under the First Amendment. *See Wiemer v. Rankin*, 790 P.2d 347, 353 (Idaho 1990). The Idaho Supreme Court has adopted the Second Circuit's approach to distinguish between factual statements and mere expressions of opinion, explaining that

> An assertion that cannot be proved false cannot be held libelous. A writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the

expressing of it may be. Liability for libel may attach, however,
when a negative characterization of a person is coupled with a
clear but false implication that the author is privy to facts about the
person that are unknown to the general reader. If an author
represents that he has private, first-hand knowledge which
substantiates the opinions he expresses, the expression of opinion
becomes as damaging as an assertion of fact.

*Id.* at 352 (citing *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977)).

As such, "[o]pinions based on false facts are actionable only against a defendant

who had knowledge of the falsity or probable falsity of the underlying facts."

*Hotchner*, 551 F.2d at 913.

In reviewing Denning's defamation claim, this Court must ask as a threshold

matter "whether a reasonable factfinder could conclude that the statements 'imply

an assertion of objective fact.'" *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th

Cir.1990) (citation omitted). If the answer is no, the claim is foreclosed by the First

Amendment. *Id.*

Here, a reasonable factfinder could conclude that Sheriff Rodriguez's

contested statements – that Denning took a file from his desk and then lied about

having done so – are factual statements, rather than opinions. Accordingly, the

First Amendment does not foreclose Denning's defamation claim.

### 2) Immunity

Under Idaho Code § 6-904(3), government employees are immune from

being sued for libel or slander (among other torts) so long as they act within the

course and scope of their employment and without malice or criminal intent.

Malice, as used in this statute, is defined as "the intentional commission of a

wrongful or unlawful act, without legal justification or excuse and with ill will,

whether or not injury was intended." *Anderson v. City of Pocatello*, 731 P.2d 171,

182-83 (Idaho 1987). There is a rebuttable presumption that any act or omission by

an employee within the time and at the place of his employment is within the

course and scope of his employment and without malice or criminal intent. Idaho

Code § 6-903(5); *Anderson v. Spalding*, 50 P.3d 1004, 1013 (Idaho 2002). [4]

Here, Denning has put forth enough circumstantial evidence to allow a jury

to conclude that Rodriguez acted maliciously when he told POST Denning had

stolen a file and lied about it. That is, a rational juror could conclude that Denning

did not taken the file and did not lie about it and that Sheriff Rodriguez acted with

ill will when he told POST Denning had done those things. Granted, the jury may

not decide the facts in this manner, but there is sufficient evidence in the record to

---

[4] Typically, in the defamation context, "actual malice" refers to a defendant's knowledge of the falsity of the defamatory statements or a reckless disregard concerning their truth, not to any subjective ill will it may have borne the plaintiff. *See Masson v. New Yorker Magazine*, 501 U.S. 496, 510 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."). Nevertheless, the Idaho Supreme Court has generally stated that the term "malice," as used in Idaho Code § 9-403 refers to commission of a wrongful act, without justification, and with ill will. *See Anderson*, 731 P.2d at 182-83.

permit such a finding. Accordingly, the Court will deny Defendants' motion for summary judgment on the defamation claim.

### D. Intentional Interference with Prospective Economic Advantage

The Court will grant defendant's motion for summary judgment on Denning's claim for intentional interference with a prospective economic advantage. To establish this claim, Denning must show: "'(1) the existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted.'" *Wesco Autobody Supply, Inc. v. Ernest*, 243 P.3d 1069, 1081 (Idaho 2010) (citation omitted).

Here, Denning does not identify any third party with whom he had a prospective employment relationship. Rather, he broadly claims that defendants interfered with his employment prospects with any and all potential future employers, regardless of the fact that he wasn't even looking for a job when the allegedly wrongful conduct occurred. This is not sufficient to make out a claim for intentional interference with prospective economic advantage. Rather, Denning should identify at least one third party with whom he had a prospective relationship, and the defendants' knowledge of that relationship. He has failed to

do so. The Court will therefore grant defendants' motion for summary judgment on this claim. *Cf. Gieseke ex rel Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W. 2d 210, 221 (Minn. 2014) (observing that the majority of state courts considering the issue require plaintiffs to demonstrate the existence of prospective economic advantage with at least one specific, identifiable third party with which the defendant interfered).

### E. Negligent Infliction of Emotional Distress (NIED)

The Court will also grant defendants' motion for summary judgment of the claim for negligent infliction of emotional distress. Plaintiff agrees defendant is entitled to summary judgment on this claim, and the Court will grant plaintiff leave to amend his complaint to comply with *Eller v. Idaho State Police*, 443 P.3d 161 (Idaho 2019) (holding that independent NIED claims are not actionable where the legal duty arises from the state whistleblower act).

### F. The Due Process Claim

Finally, the Court will deny defendants' motion as to Denning's due process claim. Denning brings his claim under 42 U.S.C. § 1983, which imposes civil liability upon any person who acts under color of state law to deprive another person of rights and privileges secured by the Constitution and laws of the United States. *See* 42 U.S.C. § 1983. Denning alleges that defendants violated his Fourteenth Amendment due process rights. *See* U.S. Const. amend. XIV, § 1 ("no

state shall deprive any person of life, liberty, or property, without due process of law").

A Fourteenth Amendment liberty interest is implicated by public announcement of the reasons for an employee's discharge. *See generally Paul v. Davis*, 424 U.S. 693 (1976); *Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 366 (9th Cir. 1976). This particular type of due process claim has come to be known as a "stigma-plus" claim. To establish such a claim, Denning must show that 1) his employer has made a charge against him that might seriously damage his standing and associations in the community, (2) the accuracy of the charge is contested, (3) the charge was publicly disclosed, and (4) the charge was made in connection with the termination of employment or the alteration of some right or status recognized by state law. *Wenger v. Monroe*, 282 F.3d 1068, 1074 (9th Cir. 2002).

### 1) Statements Made in Connection with Denning's Termination

Defendants argue that they did not make *any* contested statements "in connection with" Denning's termination. They rely on the Supreme Court's decision in *Siegert v. Gilley*, 500 U.S. 226 (1991). In that case, Siegert resigned when he was about to be fired. He found a new job and asked his former employer to provide information about him to his new employer. His former supervisor, Gilley, responded to the request; he reported that that Siegert was "inept, unethical,

and untrustworthy." *Id.* at 228. Siegert lost his new job and sued Gilley. The Court

held that Siegert failed to make out a stigma-plus claim because "[t]he alleged

defamation was not uttered incident to the termination of Siegert's employment by

the hospital, since he voluntarily resigned from his position at the hospital, and the

letter was written several weeks later." *Id.* at 234.

Here, defendants point out that Denning's termination letter did not include

any charge of immorality or dishonesty and that the report to POST followed the

termination – just like the post-resignation letter in *Siegert*. But Sheriff Rodriguez

has testified that he fired Denning for dishonesty and he filed his report with POST

within days of Denning's termination. That lapse is not long enough to sever the

temporal nexus between the termination and the damaging statements. Rather, a

jury could easily conclude that these statement were communicated to POST in the

course of Denning's termination.

Commissioner Wood's comments are a different matter. She was not

involved in Denning's termination and, moreover, she made her statements some

16 months after Denning's termination. The Ninth Circuit has ruled out a bright-

line test in terms of a temporal nexus between the statements and the termination,

but has nevertheless indicated that "[c]ommon sense and the reasoning of *Paul*

dictate that there must be some temporal nexus between the employer's statements

and the termination. At some point, defamatory statements may become too remote

in time from the termination to be considered made "in the course of the termination." *Campanelli v. Bockrath*, 100 F.3d 1476, 1482 (9th Cir. 1996) (discussing *Paul v. Davis*, 424 U.S. 693 (1976)). Given this authority, Wood's April 2019 statements cannot support Denning's stigma-plus claim. *See id.*; *Tibbetts v. Kulongoski*, 567 F.3d 529, 538 (9th Cir. 2009) (16-month span between termination and a press release publicizing the stigmatizing statement severed the temporal nexus). Denning will not be allowed to amend his complaint to add another constitutional claim based on Wood's statements. Nor can he claim that Wood's statements support his existing constitutional claim.

### 2) Public Disclosure

Defendants next argue that Denning cannot demonstrate that the contested statements were "publicized" within the meaning of a stigma-plus claim. Aside from Wood's statements, which cannot support the stigma-plus claim, there are two alleged publications: (1) Sheriff Rodriguez's report to POST; and (2) Denning's more general allegation that rumors about his termination were circulating as evidenced by a text he received from his ex-wife.

Turning first to the rumors, Denning cannot support his stigma-plus claim by pointing to rumors and then speculating that defendants were the source. *Accord, e.g., Mogard v. City of Milbank,* 932 F.3d 1184, 1191 (8th Cir. 2019) (plaintiff failed to support publication element of stigma-plus claim when he "merely

demonstrated that there are rumors in the community that he was fired for criminal behavior").

Sheriff Rodriguez's report to POST presents a more difficult issue. The Ninth Circuit has not addressed the "publication" element of a stigma-plus claim in the context of a county sheriff's office reporting alleged ethical violations to a state standards and training council. But it has more generally held that intra-governmental dissemination does not satisfy the "public disclosure" element of a stigma-plus claim. In *Wenger v. Monroe*, 282 F.3d 1068, 1074 n.5 (9th Cir. 2002), for example, the court held that there was no public disclosure when the California Army National Guard informed other branches of the military (the Army War College and the Department of the Army Inspector General's office) of a pending investigation into plaintiff's alleged misconduct. And in *Millman v. Inglish*, 461 F. App'x 627, 628 (9th Cir. 2011) (unpublished disposition), the court held that California state department employees did not "publicly disclose" stigmatizing information when they informed other public agencies of plaintiff's alleged fraud. *Id. (citing Wenger,* 282 F.3d at 1074 n.5); *see also Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010) (public disclosure requires that the defendant "actually disseminate the stigmatizing comments in a way that would reach potential future employers or the community at large"); *Reyes v. City of Pico Rivera*, 370 F. App'x 844, 844 (9th Cir. 2010) (unpublished disposition) (dissemination of an allegedly

stigmatizing report to "two City decision-makers" did not, on its own, constitute

publication, because there was no public disclosure). Given this authority, the

Court concludes that a county sheriff's report to a state-created training and

standards council does not, on its own, satisfy the "publication" element of a

stigma-plus claim.

But here, Denning's personnel file also contains a copy of the POST report.

*See Reply*, Dkt. 38, at 6. Defendants point out that Denning's personnel file is not a

public record and therefore cannot be accessed by the public. *See generally* Idaho

Code § 74-106. Denning does not argue that the public at large could obtain a copy

of the POST report by requesting the report from POST or by requesting a copy of

his personnel file. Denning does, however, generally argue that once a police

officer is charged with dishonesty, that officer cannot be hired by another law

enforcement agency.

In *Cox v. Roskelley,* 359 F.3d 1105 (9th Cir. 2004), the Ninth Circuit held

that placing stigmatizing information in an employee's personnel file constitutes

"publication" *if* the governing state law classifies the employee's personnel file as

a public record. As already noted, Denning's personnel file is not considered a

public record under Idaho state law. This suggests that Denning cannot establish

the publication element of his stigma-plus claim. But, notwithstanding *Cox v.*

*Roskelley*, 359 F.3d 1105 (9th Cir. 2004), the Ninth Circuit has not foreclosed a

compelled-self-publication theory when a law enforcement officer's personnel file is involved. *See Williams v. Madison County*, No. 4:12-cv-00561-EJL-CWD, 2014 WL 6473284 (Nov. 18, 2014) (report and recommendation; concluding that the Ninth Circuit "left the door open for those in law enforcement" to pursue a compelled-self-publication theory to satisfy the "public disclosure" element of a due process claim).

The starting point for this argument *Llamas v. Butte Community College District*, 238 F.3d 1123 (9th Cir. 2001). In that case, the plaintiff argued that his truthful response to questions on job applications regarding his discharge from employment was sufficient to satisfy the public-disclosure element of his due process claim. Notably, however, the employer had purged the personnel file to remove the reasons for the plaintiff's termination. Under those circumstances, the court held that plaintiff's self-publication did not implicate the due process clause. *Id.* at 1130-31.

The difference here, of course, is that the stigmatizing information – the POST report – remains in Denning's personnel file. Plus, there is evidence that Denning, and other law enforcement officers in general, would seemingly have no choice but to tell law enforcement agencies about a pending decertification investigation: Denning disclosed the existence of his pending decertification investigation when he applied for the Lincoln County Sheriff position, and Sheriff

Rodriguez has more generally testified that he would not hire an applicant if he knew the applicant was undergoing a POST decertification investigation. *See Rodriguez Dep.* at 170:7-13. Under these circumstances, Denning may pursue a compelled self-publication theory to support his due process claim. Put differently, the Court is not persuaded that Denning's claim fails at the "publication" element.

### 3) *Monell*

Defendants also argue that even assuming a constitutional violation, Lincoln County is liable only if a county policy – as opposed to a state statute – triggered the violation. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). Here, a critical component of Denning's stigma-plus claim is that defendants published the reasons for his termination. As already described, Denning says Sheriff Rodriguez published the reasons for his termination for purposes of a stigma-plus claim when he reported Denning's termination (and the reasons for that termination) to POST council. A report to the POST council, however, is mandatory under Idaho Code § 19-5109(5), which provides: "Any law enforcement agency . . . in which a peace officer's employment is terminated as a result of any disciplinary action *shall*, within fifteen (15) days of such action, make a report to the council." (emphasis added).

The Ninth Circuit, however, has rejected a similar argument. In *Evers v. Custer County*, 745 F.2d 1196 (9th Cir. 1984), the county defendant argued that it

should be immune because it was merely acting according to state law, rather than carrying out county policy. The court explained that such an argument "goes only to the question of the Commissioners' good faith in applying the statute. The fact that the Commissioners are immune from suit under section 1983 because of their good faith does not relieve the County from liability." *Id.* (citing *Owen v. City of Independence*, 445 U.S. 622 (1979)). Accordingly, Lincoln County cannot escape liability by arguing that it was simply complying with state law.

### 4) POST's Decertification Proceeding

Finally, defendants argue that even assuming Denning is entitled to a name-clearing hearing, he will get one in context of the POST decertification proceeding. *See Motion Mem.*, Dkt. 26-1, at 8-9.

The purpose of a name-clearing hearing "to provide the person an opportunity to clear his name." *Codd v. Velger*, 429 U.S. 624, 627 (1977). Due process guarantees only "an opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Also, at-will employees are not entitled to pre-termination hearing concerning the discharger itself; rather, they are entitled only to a name-clearing hearing, which may be post-termination. *See Eklund v. City of Seattle Mun. Court*, 628 F.3d 473 (9th Cir. 2010); *see also Board of Regents v. Roth*, 408 U.S. 564, 573 n.12 (1972).

Here, although defendants argue that Denning will be accorded due process

in the context of the POST decertification hearing, Denning still has not had a hearing. POST's policy is to stay all decertification hearings if there is a pending lawsuit. Further, POST could decide *not* to pursue decertification; in that event, Denning would not be afforded a hearing – notwithstanding the stigmatizing information that was forwarded to POST and placed in Denning's personnel file. *See Smith Dep.*, 93:4 to 94:1. So as matters currently stand, Denning was terminated and accused of dishonesty in December 2017. He sued in March 2018. He was not afforded a name-clearing hearing before he sued, and now he has no chance of being heard until after this lawsuit has been resolved. The Due Process clause requires more.

Otherwise, the Court has carefully considered defendants' remaining arguments as to why the due process claim should be dismissed and does not find them persuasive. Accordingly, the Court will deny defendants' motion for summary judgment on Denning's due process claim.

## ORDER

**IT IS ORDERED that:**

1. Defendants' Motion for Summary Judgment (Dkt. 26) is **GRANTED IN PART** and **DENIED IN PART.** Defendant's motion is GRANTED as to plaintiff's claims for negligent infliction of emotional distress and intentional interference with prospective economic advantage. The motion is DENIED as to

the remaining claims.

  2. Plaintiff's Motion to Amend (Dkt. 30) is **GRANTED IN PART** and

**DENIED IN PART** as explained above.

  3. Plaintiff shall file his amended complaint within 14 days of this Order.

      DATED: January 21, 2020

      B. Lynn Winmill
      U.S. District Court Judge